**Hamilton Estate**

*Saul, Ewing, Remick & Saul.* and *Norris S. Barratt,* for accountant.

*Clark, Ladner, Fortenbaugh & Young, Peter F. Mc-Manus* and *Joseph D. Burke,* for other heirs.

*Irving N. Kieff* and *Arthur S. Lorch,* for estate of Alice Lockwood, minor claimant.

*N. Coleman Shapiro,* p. p. trustee ad litem for unborn issue of Alice Lockwood.

*Ralph C. Donohoe,* p. p. trustee ad litem for unborn issue of other heirs.

BOLGER, J., July 5, 1956.—Decedent died March 15, 1904. This trust arose under a will dated December 2, 1901, and two codicils, copies of which are annexed.

The accountant was appointed substituted trustee by decree dated May 13, 1921.

The testator gave one fourth of his residuary estate to his executors in trust to pay the net income to his daughter, Rebecca J. Lockwood, for life, and upon her death to pay the income to the child or children of his grandson, Frank H. Lockwood, in equal shares. He further directed that with reference to children of Frank H. Lockwood living at the time of the testator's death, payments are to be made for life and with respect to children of Frank H. Lockwood born after his death, income is to be for life or until the expiration of 21 years after the death of the survivor of his children living at the death of the testator, whichever shall first occur, whereupon principal is to be distributed to the descendants of Frank H. Lockwood by representation. In default of descendants, principal is to be distributed to Wilbur F. Hamilton, Edwin E. Hamilton and Charles L. Hamilton in equal shares. All of the named contingent remaindermen are now deceased.

Rebecca J. Lockwood died March 27, 1941. Frank H. Lockwood died June 14, 1953. He was married at the time of his death and was survived by a son, Francis W. Lockwood, who was born during the lifetime of William C. Hamilton, the testator. Alice Lockwood,

a minor, was born May 14, 1952. Broad Street Trust Company has been appointed guardian of her estate. It is claimed that she is not the child of Frank H. Lockwood.

By decree dated December 8, 1953, Ralph C. Donohoe, Esq., was appointed trustee ad litem for any descendants of Francis W. Lockwood now unborn or unknown who may be interested in remainder in the estate of William C. Hamilton, deceased, and by the same decree Coleman N. Shapiro, Esq., was appointed trustee ad litem for the descendants of Alice Lockwood who might be interested in remainder in the estate of William C. Hamilton, deceased.

By stipulation of all parties in interest the finding of fact hereunder shall apply to my adjudication in the trust estate of William C .Hamilton, settlor under deed of trust dated June 21, 1901, which adjudication bears even date herewith.

The sole question for determination in this case is whether Alice Lockwood is the child of Frank H. Lockwood. Frank H. Lockwood, sometimes known as Francis Hamilton Lockwood, was married to Florence Haggy. She died September 19, 1947. There was one child born of that marriage, Francis W. Lockwood. Frank H. Lockwood married Gina S. Greco July 12, 1948. This marriage continued until the death of Frank H. Lockwood June 14, 1953. Gina Greco Lockwood died August 5, 1955. Alice Lockwood was born May 14, 1952. It is, therefore, evident that this child was born during wedlock.

The birthdate of Frank H. Lockwood was February 24, 1870. At the time Alice Lockwood was born he had attained age 82. Gina Lockwood in 1952 was 28 years old.

During their married life the couple resided in an old house on Haggy's Mill Road, Miquon, Montgomery

County. This house had neither modern plumbing nor central heating. Water had to be carried by bucket for toilet and bathing.

There were marital difficulties from time to time. Early in 1949 the wife left her husband and obtained an order against him for her support in the Court of Quarter Sessions of Montgomery County. There was a reconciliation shortly after the order was imposed. Thereafter and until September 1952, Gina Lockwood was absent from home a substantial portion of the time. As will appear more at length, she was residing in New York at the time she was delivered of the child, but returned thereafter and resumed cohabitation with her husband in June of 1952 and continued to reside there until sometime in September 1952.

In December 1952, Frank H. Lockwood became ill and went to live with Mrs. Emma Finkenbinder, who was a friend of both Mr. and Mrs. Lockwood. From there he was admitted to Episcopal Hospital where he died in June of 1953.

The presumption that a child born in wedlock is legitimate is founded in public policy. It is based upon the proposition that an innocent child should not be made the victim of the transgressions of his parents. Although the presumption is strong, it can be rebutted. In order to do so, however, evidence must be clear, direct, convincing and unanswerable: Cairgle v. American Radiator and Standard Sanitary Corporation, 366 Pa. 249 (1951).

The doctrine enunciated by Lord Mansfield that if a husband were within the four seas which bounded the Kingdom, a child born in wedlock could not be considered illegitimate has been greatly changed. In Commonwealth v. Shepherd, 6 Binney 283 (1814), the husband lived at New York; he had been separated from his wife for at least eight years, in fact it was

not known whether he was alive or dead at the time the child was conceived and born. The court held that sufficient evidence to prove nonaccess had been received.

Many cases have been cited in which the presumption was successfully rebutted and they need not be recited at length in this adjudication. They involve situations where a wife was living in open adultery by actually cohabiting with a paramour at a place from which her husband was either excluded or at some considerable distance from where he lived. In all such cases the actual sharing of a home by the married couple had ceased and there were circumstances which indicated that the probability of marital relations between the couples did not exist.

It is still the law, however, that expressions of opinion by either of a married couple which tend to prove that a child born in wedlock is not the child of the husband are admissible only when independent evidence strong enough to establish illegitimacy has been presented. Such statements are admissible as corroborating the independent evidence, but standing alone must be excluded.

Neither of a married couple can be permitted to deny access by a husband and by the word "access" is meant actual sexual intercourse.

". . . admission of such testimony would be unseemly and scandalous, and this not so much from the fact, that it reveals immoral conduct on the part of the parents, as because of the effect it may have upon the child, who is in no fault, but who must nevertheless be the chief sufferer thereby": Tioga County v. South Creek Township, 75 Pa. 433.

In this case depositions were taken at New York to establish the circumstances surrounding the birth of the child. These depositions are part of the record and

from them we learn that two days after the child was born she weighed four pounds, ten ounces. Two months previous to birth, the mother had submitted to an abdominal operation. At that time she was diagnosed as suffering from diabetes, a twisted ovarian cyst and a kidney infection. Following this operation the wound became infected.

The delivery was by Caesarean section and the infant was considered premature. The only testimony concerning prematurity was a statement of the doctor, who testified from records as follows:

"Q. Was the child a full grown child, Doctor?

"A. Premature infant.

"Q. Could you determine, Doctor, of how many months?

"A. It would be difficult to determine how many months. Prematurity is gauged mainly by weight. Five pounds and under and I would say about six weeks, two months. Then it is just a guess."

Apparently no consideration was given to the prenatal condition and illness of the mother, nor was the weight of the child at birth indicated.

The contestants claim that conception occurred sometime after September 19, 1951. The bases for this conclusion are the fact that the mother had a menstrual period early in September and the fact that the child born in May of 1952 was, in the opinion of the doctor who delivered her, premature by some six weeks or two months. Neither of these conclusions is well founded. In Commonwealth v. Young, 163 Pa. Superior Ct. 279, there is a learned dissertation on the possible length of pregnancy and reference is made to the fact that menstruation may occur more than once after actual conception. This case also recognizes that pregnancy may last as long as 336 days, although the normal period of gestation is 270 days. The auditing judge

does not believe that the contestants have limited the period during which conception occurred to any specific time and, therefore, finds as a fact that it could have happened from June 25, 1951, until October 21, 1951.

The intimacy of the parents during this period is disputed. On the one hand, it was stated by relatives of Gina Lockwood that during the interval in question, Gina Lockwood spent many days living with her husband, although she was principally residing with her parents in New York. On one occasion about two weeks after Labor Day 1951, it was testified that Frank H. Lockwood visited his wife at her mother's bungalow at Staten Island over a weekend. At that time he and his wife occupied a common bedroom. Other witnesses stated that following her hospitalization in May of 1951, Gina returned to New York and remained there for about one month. Thereafter Gina made several trips to Miquon and stayed with her husband. Some of the witnesses visited them at Miquon. Others took Gina there from New York or brought her from there to New York.

It is true that these witnesses can be considered as interested parties because of their relationship with Gina Lockwood. The auditing judge, however, finds that their credibility was not successfully impeached. He found no reason to disbelieve their testimony which was given clearly and in a manner to deserve credence.

To overcome this positive testimony, the contestants introduced evidence of a companion of Frank H. Lockwood who actually resided with him from time to time and who stated that when Gina was there, he would leave and when Gina was not living with her husband, he would actually reside there. He stated positively that Gina was not living at Miquon at any time from early in 1951 until June 1952. The testimony of this

witness was very vague concerning the critical period involved and contained contradictions concerning not only months of the year, but also concerning different years.

Another witness, an intimate friend of Frank H. Lockwood, a responsible businessman, testified clearly that during the year 1951 he frequently visited Frank H. Lockwood. On some occasions he remained there for several hours. At no time during the spring, summer or autumn did he see either Gina Lockwood or members of her family at Miquon. The auditing judge believes this testimony, but observes that it in no way excludes the possibility that Gina was living with her husband at intervals during the time in question when the witness, Mr. Ketcham, was not there.

The principal witness in behalf of the contestants was Emma Finkenbinder. This witness conducted a rooming house at 7043 Ridge Avenue which is described as being about four miles from the residence of Mr. and Mrs. Lockwood at Miquon. She testified that following the illness of Gina Lockwood, which resulted in her hospitalization in May of 1951, until September 23, 1951, Gina Lockwood at no time visited her husband at Miquon and that from September 23, 1951, until October 18, 1951, Gina resided in her home on Ridge Avenue and during that entire period was never absent excepting upon three occasions when she went out with a boarder named Jack Vermillion. This witness testified that Gina Lockwood and Vermillion were fond of each other and on one occasion remained away from home until 2 o'clock in the morning.

Her testimony falls far short of convicting Vermillion and Gina Lockwood of adultery. Even if Gina had been proved unfaithful to her husband, this would not have disproved access. The auditing judge believes that this witness convicted herself of incredibility by her

acknowledgment that she has no memory for dates or times unless it is written down. In an effort to refresh her recollection she referred to a book which, on cross-examination, it developed contained various memoranda extracted by her immediately prior to the trial of this case from another book which she kept in the course of her business as the proprietress of a boarding house. The auditing judge believes, in view of the glaring inaccuracies contained in this transcript, Mrs. Finkenbinder's recollection of given events to which she testified was unbelievable.

The contestants introduced a birth certificate showing that Gina Lockwood and Frank H. Lockwood were the parents of the child. It states that Frank H. Lockwood, the father, was 36 years of age. It is not shown who gave the information to the nurse or doctor who procured the same for the purposes of the record. The auditing judge believes that the birth certificate is not of any evidentiary value in this case.

It is acknowledged that subsequent to delivery, Frank H. Lockwood accepted the child and her mother into his home. In July of 1952, the child was insured with his knowledge and consent and the application for insurance indicates that the beneficiaries and their relationship to the insured are Gina or Francis H. Lockwood, parents.

The contestants introduced evidence in the nature of declarations by Gina Lockwood and by Francis H. Lockwood in which each is alleged to have stated that Frank H. Lockwood was not the father of the child. These statements were admitted over objection and a ruling was reserved. The auditing judge now rules that these statements of opinion cannot be considered for the reason that the contestants failed to proved by independent evidence that Frank H. Lockwood did not have access to his wife.

A blood test was made but the results were not presented. The auditing judge must presume that Alice had the same type of blood as Frank H. Lockwood.

Frank H. Lockwood was a vigorous man until his terminal illness. He had enjoyed exceptionally good health. No evidence was submitted to show that he was impotent. His great hobby was the ownership and display of antique automobiles. He pursued this hobby until his death; in fact, there was substantial testimony that he and Gina attended an automobile show at the Devon Horse Show grounds in October of 1951. This was disputed because of the period of time involved, but it was acknowledged that Frank Lockwood was active, lived under conditions which today are considered primitive in both winter and summer. Several witnesses on both sides of the case acknowledged that he was a difficult and irascible man. His son, Francis W. Lockwood, although he lived in an adjoining property, quarreled with him and for a period of several years never had any conversation with him. It is true that the marriage did not function smoothly and that there were many periods of separation. All of them appear to have been voluntary on the part of Gina. The physical hardships induced by the lack of facilities could well explain these absences. There is nothing in the record to show an estrangement or hatred that would negative the possibility of access. Whenever Gina returned, she apparently was welcome. Letters written by Frank H. Lockwood to his wife in early 1952 were introduced in evidence showing that he regarded her most affectionately. There is nothing to show that the husband rejected the wife.

The auditing judge is of the opinion that the contestants have failed to overcome the presumption of legitimacy and, therefore, finds as a fact that Alice Lockwood is the child of Francis H. Lockwood. . . .